986 F.2d 1421
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
BOARD OF EDUCATION OF HENDERSON COUNTY, KENTUCKY, Plaintiff-Appellant,
v.
SPINAZZOLO SYSTEMS, INC., Defendant-Appellee.
 No. 92-5013.
 United States Court of Appeals, Sixth Circuit.
 Feb. 9, 1993.
 
 Before KENNEDY and MILBURN, Circuit Judges, and WELLFORD, Senior Circuit Judge.
 WELLFORD, Senior Circuit Judge.
 
 
 1
 The defendant, Board of Education of Henderson County, Kentucky (the Board), appeals from a district court order awarding damages and prejudgment interest to contractor Spinazzolo Systems, Inc. (Spinazzolo) in this diversity breach of contract action. For the following reasons, we REVERSE.
 
 I. FACTS
 
 2
 In 1982, the Henderson County Board of Education began preparations to remove asbestos fibers discovered in the ceilings and pipe insulation in sixteen schools. It hired Gobbell-Hays Partners, Inc., (Gobbell), an architectural firm, to outline specifications for the project and to prepare a package proposed for use in soliciting bids for this project.
 
 
 3
 The bid package contained proposed contract provisions and drawings identifying areas of the schools requiring asbestos removal. Gobbell's drawings were computer generated versions of the original blueprints for these schools. Printed on each drawing contained in the bid package was the scale used in the original blueprints: one inch equals eight feet. That scale was accurate for thirteen of the sixteen schools. For three schools, however, the scale was incorrect; Gobbell reduced the original blueprint but failed to adjust the scale to reflect this reduction. As a consequence, the bid package indicated that three schools were substantially smaller than their actual size.[1]
 
 
 4
 The plaintiff Spinazzolo received its bid package on May 20, and bids were due by May 25. A company representative briefly visited the schools, including the three now in dispute, and Spinazzolo bid on the contract. Spinazzolo's bid--more than $50,000 lower than the next lowest bid--was accepted by the Board. The district court found that Spinazzolo had relied on the incorrectly scaled drawings when figuring its bid, and, consequently, that Spinazzolo had "substantially" underestimated the amount of work required.
 
 
 5
 During the course of the project, Spinazzolo discovered the erroneous scale on the three schools and brought the discrepancies to the Board's attention. Spinazzolo contended that language in the bid package invited it to rely on the bid documents, and that the work associated with the discrepancies was "extra work" under the contract. The Board maintained that disclaimers in the bid package adequately warned Spinazzolo not to use the scale on the reproduced drawings when figuring actual dimensions. Without resolving this disagreement, the parties proceeded toward completion of the project.
 
 
 6
 After Spinazzolo had substantially completed the contract, the Board sued Spinazzolo for certain property losses and for liquidated damages for delay in completion. Spinazzolo counterclaimed, seeking damages for the balance of the contract price allegedly unpaid and for the "extra work" performed as a result of the erroneous drawings.[2]
 
 
 7
 Following a bench trial, the district court found the Board liable to Spinazzolo on its counterclaims. The court held that under Kentucky law, an owner impliedly warrants the fitness of the plans and specifications he provides to a contractor and that the contract in this case was ambiguous concerning the extent to which Spinazzolo could rely on the drawings. Accordingly, it awarded Spinazzolo damages for "extra work" and also for the balance of the contract price, less certain set-offs.[3] The court awarded prejudgment interest on the contract price award and post-judgment interest on the "extra work" claim.
 
 
 8
 Arguing that disclaimers in the bid package shield it from liability for the inaccurate scaling, the Board appeals from the district court order awarding damages for "extra work." The Board also contends for the first time on appeal that the award of prejudgment interest violated principles of sovereign immunity applicable under Kentucky law.
 
 II. STANDARD OF REVIEW
 
 9
 This court reviews interpretations of contract language de novo. FDIC v. Aetna Casualty & Surety Co., 903 F.2d 1073, 1077 (6th Cir.1990). The district court's decision to award "extra work" damages to Spinazzolo rested on the conclusion that the Board "warrantied the drawings for fitness." Op. at 8. Implicit in the court's finding that the Board impliedly warranted its drawings is a finding that the contract language permitted Spinazzolo to rely on the drawings for dimensional accuracy. Differentiating between what may and what may not be inferred from particular contract language involves interpretation of the contract. The district court's decision to award "extra work" rested on its interpretation of the contract, and is therefore reviewable de novo. See Aetna, 903 F.2d at 1077, 1079 (reviewing de novo a district court finding that certain losses were "discovered" by the defendant within the meaning of the contract); Messer v. Paul Revere Life Ins. Co., 884 F.2d 939, 940-41 (6th Cir.1989) (reviewing on the de novo standard a district court ruling that a conversion provision in insurance contract did not entitle decedent to double indemnity death benefits); Davis v. Sears, Roebuck & Co., 873 F.2d 888 (6th Cir.1989) (whether action allegedly conflicting with oral representations and past practices gave rise to breach of implied covenant of good faith and fair dealing involved contract interpretation and was reviewable de novo).
 
 
 10
 Because of the error in scaling on the bid package documents, the district court found that the three schools involved in this controversy appeared to be "substantially smaller than their actual size." Spinazzolo concededly had five days to prepare and submit a bid. Spinazzolo, or its representative, visited each of the schools, and the district court found that project "specifications also indicated that contractors preparing bids should make a thorough examination of the sites and verify all dimensions contained within the documents." The district court's finding that "asbestos cannot be identified in the field" is irrelevant to the extra work claim, because, for each building, the plans and specifications accurately identified the areas containing asbestos. Even though the plans were schematically correct,[4] the district court noted that the plans were "defective" because they were improperly scaled,[5] and concluded that this defect breached the implied warranty of fitness recognized by Kentucky law. Unlike the dissent, we find the district court's conclusions on warranty of fitness and justifiable reliance to be essentially legal conclusions, not factual findings. Accordingly, we apply a de novo standard of review and believe the district court's conclusions are incorrect under all the circumstances.
 
 III. DAMAGES FOR EXTRA WORK
 
 11
 The district court relied on McGovney & McKee, Inc. v. Berea, 448 F.Supp. 1049, 1056 (E.D.Ky.1978), for the proposition that an owner warrants the plans and specifications he provides for "fitness." The court held that, "[w]hen the Board and Gobbell provided the bid documents containing the defective drawings, they impliedly warranted the fitness of the documents." Op. at 6.
 
 
 12
 We find the district court's reliance on McGovney to be misplaced, because it does not apply to claims for extra work. The implied warranty found in McGovney relieved the contractor of liability for damages since the latter completed the project as the owner directed. We do not construe McGovney to insulate a contractor from doing more work than he anticipates.[6]
 
 
 13
 Even if McGovney were deemed to apply, there is a crucial difference between the facts in McGovney and the facts here. The contract in McGovney contained no specific disclaimers aside from general standardized "boilerplate" language advising the contractor to visit the site and to confirm construction conditions. McGovney, 448 F.Supp. 1049 (1978). In this case, however, the Board's bid package included specific disclaimers warning contract bidders not to rely on the drawings. There is no indication in McGovney that the court would have found an implied warranty had specific disclaimers existed. We are of the view that McGovney is not controlling under these circumstances.
 
 
 14
 Instead, we find that Codell Construction Co. v. Commonwealth, 566 S.W.2d 161 (Ky.Ct.App.1977) establishes the proper framework for analysis. See also Dravo Corp. v. Commonwealth, 564 S.W.2d 16 (Ky.Ct.App.1978). Like this case, Codell involved a claim for extra work wherein the owner's plans underestimated the amount of work necessary to complete the job.[7] Noting the presence of specific disclaimers, the Codell court explained that the "fundamental consideration ... is whether the contractor unjustifiably relied on the information provided by the Highway Department."[8] The court addressed the issue of justified reliance in the face of government issued disclaimers:
 
 
 15
 Generally government agencies can provide bidders with estimates and other related information without incurring a risk of liability as to the accuracy of such information and estimates, only so long as their intent to do so is made clear by an express and unqualified disclaimer as to the accuracy of the information. (emphasis added).
 
 
 16
 Codell,566 S.W.2d at 164. The disposition of this case depends on whether the disclaimers in the Board's bid package met the standard announced in Codell.
 
 
 17
 The disclaimers in Codell were printed on the plans as well as in the contract documents. The disclaimers were specific and warned that "information with respect to rock and earth, was solely for the Department's information and not to be taken as an indication of classified excavation, or the quantity of either rock or earth or any other material involved." Id. at 163. The court found that the contractor could not justifiably rely on the plans.
 
 
 18
 Significant exculpatory language appeared in three places in the contract and bid package issued by the defendant Board. A section entitled "SUMMARY OF WORK" contained a standard warning requiring the contractor to familiarize himself with the site.[9] By itself, this language falls short of the standard set forth in Codell. See United States v. Spearin, 248 U.S. 132, 137 n. 1 (1918); Codell, 566 S.W.2d at 164.
 
 
 19
 A more specific disclaimer and instruction, however, appeared in the section identified as "Modifications to Article 7." This disclaimer provided:
 
 
 20
 All Drawings, together with such noted delineations, figures and details, as may be noted thereon shall be considered part of and complimentary to the Specifications. Full size Drawings and large scale details shall, in general, govern and take precedence over small scale Drawings which they are intended to amplify. Figure dimensions. Do not obtain dimensions by scaling Drawings. (emphasis in original).
 
 
 21
 The modifications appeared in a separate, appended section entitled "SUPPLEMENTARY GENERAL CONDITIONS" and appeared in a different type. The final significant disclaimer appeared in the drawings section under the heading "GENERAL NOTES." That disclaimer provided:
 
 
 22
 1. The drawings are for schematic purposes only. It is the contractor's sole responsibility to verify all dimensions and existing conditions.
 
 
 23
 2. Pipe and duct insulation to be removed is drawn schematically. The contractor shall verify all dimensions of insulation ... of the type referenced at each site to be removed.
 
 
 24
 (emphasis added). The relevant question is whether these disclaimers, taken together, rise to the level of an "express and unqualified disclaimer as to the accuracy of the information" such that reliance on the plans was unjustified. Codell, 566 S.W.2d at 164.
 
 
 25
 The contract was not entirely clear about not relying on the bid drawings. The Board has not explained why there was no warning that the scale might be misleading on the drawings themselves.[10] Additionally, the bid package contained language Spinazzolo contends invited it to rely on the architect's drawings.[11] The district court found that Spinazzolo had followed the recognized construction industry practice in calculating its unit costs by the drawing dimensions.
 
 
 26
 We are satisfied that the language warning contractors not to rely on the scaled drawings could hardly have been clearer: "Do not obtain dimensions by scaling Drawings." Spinazzolo should have recognized this warning that the scales might be inaccurate. Additionally, the board noted under section 1 of the general conditions relating to the drawings that they were intended for schematic purposes only: that is, they detailed only the location of the asbestos, not the dimensions of the areas where it existed.[12]
 
 
 27
 The obvious intent of the exculpatory language was to avoid the possibility that a contractor could claim that the bid drawings misled him as to the scope of the project. Furthermore, "[t]he rule in construing contracts to which the government is a party is to resolve all ambiguities, presumptions and implications in its favor." Codell, 566 S.W.2d at 164. Consequently, we hold that, construing the language in favor of defendant, the exculpatory language in the contract was sufficient to impose the burden of making actual field measurements on the bidder. Spinazzolo made no such measurements despite visiting the schools, and must suffer the consequences of its failure to verify and check the measurements in question.
 
 IV. PREJUDGMENT INTEREST
 
 28
 Generally, this court will not address arguments raised for the first time on appeal. Boone Coal & Timber Co. v. J.M. Poulan, 787 F.2d 1056, 1064 (6th Cir.1986). Nevertheless, this court has expressed a willingness to depart from the general rule in " 'exceptional cases or particular circumstances' or when the rule would produce 'a plain miscarriage of justice.' " Pinney Dock and Transp. Co. v. Penn Cent. Corp., 838 F.2d 1445, 1461 (6th Cir.), cert. denied, 488 U.S. 880 (1988) (quoting Hormel v. Helvering, 312 U.S. 552, 557-58 (1941)). Invocation of this discretionary exception is appropriate where the issue is wholly legal, the parties have extensively briefed it, and the issue is "presented with sufficient clarity and completeness" to decide it. United States v. Pickett, 941 F.2d 411, 415 (6th Cir.1991) (quoting Pinney Dock, 838 F.2d at 1461). In the present case, the issue is wholly legal (whether prejudgment interest may be awarded against a state agency without an express statutory provision) and the parties have extensively briefed it.
 
 
 29
 Generally, state actors in Kentucky are not liable for prejudgment interest on public debts absent a statute or contractual provision to the contrary. % Commonwealth Dept. of Transp. v. Lamb, 549 S.W.2d 504, 507 (Ky.1976). A statute waiving immunity to suit, moreover, does not automatically waive immunity to prejudgment interest. Powell v. Board of Educ., 829 S.W.2d 940, 941 (Ky.App.1991).
 
 
 30
 Powell indicates that "a statute waiving immunity must be strictly construed and cannot be read to encompass the allowance of interest unless so specified." Id.[13] The statute upon which the Board was sued has no provision addressing prejudgment interest. Ky.Rev.Stat.Ann., § 45A.245 (Michie/Bobbs--Merrill 1990).
 
 
 31
 Spinazzolo also argues that Powell and its predecessors should not apply to this case because the government was the plaintiff. In All American Movers v. Kentucky ex rel. Hancock, 552 S.W.2d 679 (Ky.Ct.App.1977), the court found that:
 
 
 32
 where the state [is] the plaintiff, the defendant [becomes] at once entitled to maintain any counterclaim he had against the state, even though he could not have set up the counterclaim as an original cause of action because of sovereign immunity.
 
 
 33
 Hancock, 552 S.W.2d at 681.
 
 
 34
 Spinazzolo's argument is unpersuasive. First, Hancock does not address the issue of prejudgment interest, nor does its reasoning suggest that the government, by becoming a plaintiff, waives immunity to interest awards. Hancock applies where there is no statute under which the defendant/counterclaimant could sue. In this case, there is a statute pursuant to which Spinazzolo could have brought suit. Ky.Rev.Stat.Ann. § 45A.245 (Michie/Bobbs--Merrill 1990). Under Powell, the right to prejudgment interest does not accompany suits brought under that statute, since the statute does not expressly permit interest awards.
 
 
 35
 The rationale underlying the general unavailability of prejudgment interest against government entities, moreover, is equally applicable whether the government is plaintiff or defendant. The court in Banker's Bond Co. v. Buckingham, 97 S.W.2d 596 (Ky.1936) explained:
 
 
 36
 The theory upon which this rule is based is that whatever interest is allowed either by statute or by common law, except in cases where there has been a contract to pay interest, it is allowed for delay or default of the debtor. The delay or default cannot be attributed to the government. It is presumed to be always ready to pay what it owes. The apparently favored position of the government in this respect has been declared to be demanded by public policy.
 
 
 37
 Id. at 599.
 
 
 38
 Because the relevant statute does not authorize ordering prejudgment interest against the government, we REVERSE the district court's award of prejudgment interest granted to Spinazzolo on the balance of the contract price.
 
 
 39
 In sum, we award plaintiff the total amount of $43,500 in damages to serve as an offset to the balance due to Spinazzolo on the contract of $89,497.65, a net award of $45,997.65 due the defendant on its counterclaim.
 
 
 40
 KENNEDY, Circuit Judge, concurring in part, dissenting in part.
 
 
 41
 I concur in part IV of the Court's opinion but respectfully dissent from the holding that Spinazzolo was not entitled to be paid for extra work. The District Court held that rather than an "express and unqualified disclaimer as to the accuracy of the information," the contract documents were ambiguous in that sections 01100 and 02071 of the Board's bid invitation specifications indicate that Spinazzolo was to rely on the specifications and the drawings.[1] This is a question of law which we review de novo. I agree with the District Court's conclusion that the contract is ambiguous and the disclaimers are not express and unqualified.
 
 
 42
 Although the District Court found that the specifications also indicated that contractors preparing bids should make a thorough examination of the sites and verify all dimensions, the documents did not contain statements indicating the documents were not to scale. It found that the contract was for removal of asbestos "as indicated on the drawings and specifications." The District Court further found:
 
 
 43
 Utilizing the regular and widely-recognized practice throughout the construction industry, Spinazzolo arrived at its bid price by multiplying its unit costs for work and the pertinent dimensions within the construction documents to arrive at a total bid price. Plans for three of the buildings were defective. The three buildings were as much as 40% larger than what the plans indicated. While the Board argues that this difference is "minor," I find the defects constitute a substantial error.
 
 
 44
 The court also found that asbestos cannot be identified in the field but only in a laboratory setting and that the Board hired Gobbell-Hays Partners, Inc. to survey the schools and obtain samples for this purpose. Using that information, it prepared documents and drawings to identify areas of asbestos so that contractors could prepare bids. The contractors thus could only prepare bids from the specifications. It was under these circumstances that the court found that the standard language that the contractor should verify all dimensions was ambiguous since the contractor had no way of knowing what was asbestos and what was not. Paragraphs 1 and 2 of the "GENERAL NOTES," relied on by the majority on page 9, could have no application. The majority also relies on language in Modifications to Article 7 and particularly the statement, "[d]o not obtain dimensions by scaling Drawings." Although Spinazzolo relied on the drawings, it did so in conjunction with the specifications and the bid documents. This is not a case where a dimension was wrong on a drawing and scaling it gave the wrong area. Here, the entire drawing had been reduced in size without advising the bidders. There was no warning of this defect in the documents. The District Court concluded that the Board, through its agent Gobbell, warranted the fitness of the drawings and that the contractor was, under all the circumstances here, justified in relying on the defective documents.[2] I believe that whether reliance was or was not justified is a factual finding which is not clearly erroneous.
 
 
 45
 The Board does not dispute that when an owner provides plans and specifications for a construction project, the owner impliedly warrants the fitness of the plan. The majority recognizes that the case thus turns on whether the disclaimers in the contract documents made reliance on them unjustified. As in Codell Construction Co. v. Commonwealth, 566 S.W.2d 161 (Ky.Ct.App.1977), [t]he fundamental consideration which must be reviewed in this matter is whether the contractor unjustifiably relied on the information provided by the Highway Department."
 
 
 46
 The court in Codell went on to say in language the majority quotes that disclaimers of the warranty must be made clear "by an express and unqualified disclaimer as to the accuracy of the information." Id. at 164. There was no such disclaimer of the accuracy of the drawings. In Codell, the contract was to remove 2,122,718 cubic yards of earth and rock. The bid document showed a profile of where each could be expected to be encountered. The bidders were told that information with respect to rock and earth was solely for the Highway Department's information and not to be used to determine the quality of either rock or earth. Thus, the disclaimer was express and unqualified. Here, although the boiler plate language spoke of the contractor verifying all dimensions, the parties knew that the contractor could not identify what surfaces, etc., contained asbestos and what did not.
 
 
 47
 The District Court's finding that Spinazzolo did not unjustifiably rely on the information supplied is, in my opinion, amply supported by the record and not clearly erroneous. I would AFFIRM the holding that the Board is responsible for the additional costs arising from the defective documents.
 
 
 
 [1]
 The actual scale for the three inaccurate drawings was as follows:
 South Junior High: 1 inch = 16 ft.
 Bendgate: 1 inch = 10.7 ft.
 South Heights: 1 inch = 10.6 ft.
 South Junior High was 100% larger and Bendgate and South Heights were approximately 33% larger than the drawings indicated.
 
 
 [2]
 The remainder of the contract price was $89,497.65, and the damages claimed for "extra work" were $123,590
 
 
 [3]
 The court awarded Spinazzolo $123,590 in damages for "extra work" less a stipulated set-off of $37,500 for property damage and property losses. The court awarded post-judgment interest at 12% on the resulting balance of $86,090. The court also awarded $89,497.65 on Spinazzolo's claim for the balance of the contract price, less a $6,000 set-off for construction delays. The court ordered prejudgment interest on the $83,497.65 balance
 
 
 [4]
 We note a difference between schematic and scaled accuracy. The plans were schematically accurate because they correctly showed which areas contained asbestos. They were not scaled accurately, however, because, in some cases, they understated how large the areas containing asbestos were
 
 
 [5]
 The Board conceded that the plans were defectively scaled
 
 
 [6]
 In McGovney, the local water table was higher than the owner's plans estimated. McGovney, 448 F.Supp. at 1054. Owing to the contractor's faulty installation procedures, an aeration tank "floated," causing delays and damage to the tank. Id. The owner terminated the contract because of the delays due to the higher water table levels. Faulty installation procedures, rather than the inaccurate plans caused the tank to float. Nevertheless, by dicta, the court implied that, had the tank floated because the plans showed the water table too low, then the owner, not the contractor, would be responsible
 
 
 [7]
 In Codell, a highway contractor had to excavate more rock than government estimates indicated. Codell, 556 S.W.2d at 163
 
 
 [8]
 The Highway Department published results of soil tests that estimated the depth of the rock line. The line was actually higher than the tests indicated and the excavator hit rock before he had anticipated. Codell, 566 S.W.2d at 163
 
 
 [9]
 In pertinent part, the clause read:
 SITE INVESTIGATION:
 The Contractor acknowledges that he has satisfied himself as to the nature and location of the Work, the general and local conditions,..... Any failure by the Contractor to acquaint himself with all the available information concerning these conditions will not relieve him from responsibility for estimating properly the difficulty or cost of successfully performing the Work. Contractor is to field verify all conditions, dimensions, etc. relative to this project prior to bidding.
 
 
 [10]
 In both Codell and Dravo, warnings appeared on the plans as well as in the contract documents. Codell, 566 S.W.2d at 164; Dravo, 564 S.W.2d at 18
 
 
 [11]
 Section 01100 describes the base bid work as:
 The removal of all asbestos-containing materials from 16 Henderson County schools and the replacement of ceiling material where removed in all schools as indicated on the drawings and specifications.
 (emphasis added).
 
 
 [12]
 Spinazzolo may not have been able to determine the location of the asbestos merely by visiting the schools, but it could easily have checked room sizes and dimensions
 
 
 [13]
 Spinazzolo cites Commonwealth, Dep't of Highways v. Young, 380 S.W.2d 239, 240 (Ky.1964), which we find to be inapposite here, because it was construing a waiver of immunity statute that provided that any judgment against the government "shall have the same effect and be enforceable as any other judgment of the court...." No such language appears in the applicable statute here
 
 
 *
 Section 01100--The removal of all asbestos-containing materials and replacement of ceiling material where removed as indicated on the drawings and specifications
 Section 02071--Removal, as specified, of all spray-applied and/or trowel-applied asbestors-containing material located as indicated on drawings.
 Joint Appendix at 115, 130.
 
 
 [2]
 On pages 4-5 the majority states that the District Court's conclusion that the Board warranted the drawings for fitness was based on its finding that the "contract language permitted Spinazzolo to rely on the drawings for dimensional accuracy." I disagree. The District Court stated that under Kentucky law, not under its interpretation of the contract, "owners supplying drawings to contractors warranty those drawings for fitness." District Ct.Op. at 8 (citing McGovney & McKee, Inc. v. Berea, 448 F.Supp. 1049, 1056 (E.D.Ky.1978) (citing Culbertson v. Ashland Cement & Construction Co., 139 S.W. 792 (1911))